PONDER, Judge.
Defendants have appealed the judgment giving plaintiffs damages for injuries resulting from an automobile accident.
The issues are:
*MCDXXXIII 1. the applicability of the deduction of $100.00 from the claim against Louisiana Insurance Guaranty Association;
2. the credit to be allowed Louisiana Insurance Guaranty Association for payments made by other insurance companies;
3. causation of injuries;
4. sufficiency of proof of lost wages;
5. quantum for general damages.
We amend and affirm as amended.
Defendant, Lee, dropped a cigarette into his lap while lighting it. He lost control of his car and struck the car belonging to Roy Harris and occupied by him and his wife, Sandra, who sustained serious injuries. Lee had a liability insurance policy, with limits of $5,000.00 for injuries to each person with Manchester Insurance and Indemnity Company, which was later declared insolvent. Louisiana Insurance Guaranty Association assumed the obligation of Manchester. Plaintiffs’ group medical insurer paid $1,319.23 for medical expenses. After trial the court gave judgment to Sandra Harris for $5,000.00 in solido against Lee and LIGA and to Roy Harris for $700.00 in solido against Lee and LIGA. In addition the court awarded $40,000.00 for general damages to Sandra Harris and against Lee and $14,154.09 to both Roy and Sandra Harris and against Lee. The latter figure was comprised of $12,500.00 for lost wages, $1,354.09 for medical expenses and $300.00 for future medical expenses.
Appellants complain that the trial court erred in not recognizing a $100.00 deductible afforded LIGA by the statutes, in not giving credit to LIGA for the $1,319.23 paid by Allstate and in awarding excessive amounts for lost wages and for Mrs. Harris’ injuries.
We believe that the statute is quite clear that LIGA is responsible only for the amount of the covered claim in excess of $100.00 subject to the limit of the policy in the insolvent company and subject to a limit of $50,000.00. We therefore find that the lower court erred in not recognizing that deductible.
Under La.R.S. 22:1386 a person “having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under such policy.”
The lower court found that this provision does not require that credit be given to LIGA for the payment made by Allstate because of the collateral source rule and because La.R.S. 22:1377 does not include health and accident insurance coverage. The collateral source rule that a defendant does not receive credit for payments made to a plaintiff from an insurance policy to which the wrongdoer did not contribute can have no application when a statute provides for that credit. The provisions of Section 1377 provides for exemption of certain forms of insurance to the LIGA law, that is health and accident policies, for instance cannot be collected through the provisions of LIGA. The provisions of Section 1386 seem quite clear that a claimant must exhaust his remedies against any other insurance policy other than one in an insolvent company before being able to collect through LIGA. We therefore believe the lower court erred in not allowing that credit.[1]
Mrs. Harris’ testimony as to her injuries and disability was as follows. She was taken to the hospital suffering with neck problems on the right side and lower back; bruises on the elbows, knees, legs and arms and scratches on arms, knees and shins. She was seen there by Dr. Alford, her gynecologist, who gave her two shots and had X-rays taken. At that time she could not turn her neck to the left and she had a “catch” in her back with pain radiating down her legs. She was not kept in the hospital but was later sent to Dr. Matta, an orthopedist, who took X-rays and administered a cortisone injection. She saw him 7 to 8 times. During this interval she could not stoop or touch her toes, could not get out of bed normally and had continuous neck and back pain. Dr. Alford then sent her to Dr. Flynn who had her admitted to the hospital and had her subjected to trac *MCDXXXIV tion for two weeks and then had a myelo-gram performed. He prescribed pain pills and muscle relaxers. Thereafter she went to a chiropractor for adjustments. Her lower back was moving better. She has shooting pains in her leg, can no longer participate in sports as she did before, cannot vacuum her house, move furniture or do gardening. Her neck hurts in damp weather. She was still on pain medication, still had complaints of pain in her back and legs at the time of trial. She did not tell Dr. Flynn that she had experienced intermittent back pain for years. Instead she told him she had periodic back pain associated with the menstrual cycle, a different pain entirely from the “cutting” pain resulting from the accident. She consulted a Dr. Phillips for an unrelated problem. She had had a hysterectomy a few days before the accident.
Dr. Flynn testified that she told him she had experienced intermittent back pain for years but had felt worse since the accident with pain in both legs down to the knee. Her back pain predated the accident but now she felt incapacitated by the pain. He found no evidence of muscle spasms, of limited mobility or nerve root irritation. The examination was within normal limits. Because he originally felt she might have a midline disc protrusion with a history of progressive back and bilateral leg pain, he had her admitted to the hospital for traction and physical therapy. When eight days of this did not help he performed myelography on her. This was entirely within normal limits. She was in the hospital a total of ten days. She complained bitterly of back and leg pain but exhibited no objective neurological findings. He felt that she was anxious and neurotic with a low pain threshold. He last saw Mrs. Harris on November 4, 1976, nearly two years before the trial.
Dr. Lensgraf, a doctor of chiropractic, who saw her first almost two years after the accident, testified she complained of lower back pain radiating down her legs, preventing her sleeping and giving her problems walking and standing. He made X-rays and did a spinal exam. He found problems in the neck, the lumbosacral area, the pelvis and sacral area of the spine. She had extreme tipping of the cervical curve, and had a slight rotary type of scoliosis in upper dorsal area. The disc spacing was normal. However there was extreme change in the inter-odontoid (interverte-bral?) space that could cause nerve root irritation. There was subluxation in the lumbosacral articulation with related pelvis rotation. There was some swelling at L-5 sacrum and limited motion bending forward. He had a practice of advising his patients with this type of complaint to rest and to avoid stooping, bending and similar activities. He felt her spinal problems were not congenital but were caused by injury. She did not mention any previous back problem. In response to a question as to whether this type of spinal muscular problem would get well on its own eventually, Dr. Lensgraf stated that from her X-rays and the degree of problem in the low back there was little chance that it would ever heal sufficiently to get well. He charged her for a total of eight times and had not seen her for nearly a year at the time his deposition was taken.
Neither Dr. Matta nor his associate, Dr. Booker, testified. Two very terse reports were admitted into evidence. These disclose that the two saw Mrs. Harris on July 26 and 29, August 5, and 11 and September 15, 1975. An appointment was made for October 13 but evidently was not kept. Dr. Flynn, from the evidence, was the next doctor to see Mrs. Harris for injuries received from the accident. There is documentary evidence that Drs. Alford and Phillips saw Mrs. Harris in October, 1975 but she testified that this was unrelated to the accident. Dr. Flynn last saw Mrs. Harris on November 4, 1976. Dr. Lensgraf did not see her until June 26,1977. It was stipulated that no adverse presumption would attach to the failure of Dr. Alford to testify, and we make none; but we cannot but note that his testimony would have been helpful in explaining the otherwise unexplained gaps in Mrs. Harris’ medical treatment. Because of these gaps and the positive testimony of Dr. Flynn, we conclude that the trial court erred in ascribing any disability resulting from the accident beyond Novem *MCDXXXV ber 4,1976. Dr. Lensgraf’s conclusions necessarily were based upon the history given him. We believe that he came to incorrect conclusions, which also led the trial court into error. The lack of corroboration, either medical or otherwise, of Mrs. Harris’ account of continuous disability constitutes a serious deficiency in the proof necessary.
For these reasons, we believe the award of $45,000.00 to Mrs. Harris is excessive and the award is reduced to $15,000.00 as the largest amount that could reasonably be awarded to her.
Mrs. Harris’ testimony in regard to lost wages was that she was employed at I. H. Rubensteins at the time of her accident at a rate of $2.65 per hour for 37 to 40 hours per week. At an unspecified time after the accident she tried to work for about two months. She was unable to continue and was unemployed until about two and one-half months before trial when she tried to work again for another two months at $2.85 per hour. She quit after two months.
This testimony is not corroborated by any other testimony, even that of her husband, or any documents such as stubs of checks or income tax returns. The nearest and only approach toward corroboration is the testimony of Dr. Lensgraf that he made no note in his records on her first visits to him nearly two years after the accident of any recommendations of limitation of physical activity but any patient with this type problem was routinely advised to avoid lifting and stooping and that after each chiropractic adjustment the patient is advised to rest at least an hour.
Furthermore, we have concluded above that Mrs. Harris has not proved disability resulting from the accident beyond November 4, 1976. We therefore reduce the award to 14 months of lost wages or $5,981.05.
The receipts for drugs contain some that predate the injury, some that are duplicates, some that are unexplained and some that are dated after November 4,1976. After eliminating these, we add the drug bills to $81.94 which is the amount we allow.
For reasons explained above we eliminate the bill of Dr. Lensgraf and his estimate of future medical expenses, which incidentally, Mrs. Harris did not incur.
We also conclude that in regard to past medical expenses, Mrs. Harris introduced invoices from Seventh Ward General Hospital for $186.90, from Baton Rouge General Hospital for $936.11, from Dr. Flynn for $349.00 and from Dr. Matta for $140.00. This totals $1,612.01, which we allow in its entirety.
For these reasons the judgment is amended so as to award Mrs. Harris $3,580.77 in solido against Lee and LIGA and to Roy Harris on behalf of the community for $700.00 in solido against Lee and LIGA. The judgment is further amended to award $10,000.00 to Mrs. Harris against Lee and to award $7,675.00 to Roy Harris on behalf of the community and against Lee. As amended the judgment is affirmed. The costs are assessed against plaintiffs.
AMENDED AND AFFIRMED.

. Billeaudeau v. Lemoine, 377 So.2d 1344 (1st Cir. 1979).